## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

JCORPS INTERNATIONAL, INC.,

        *Plaintiff*,                      Civil Action No.  4:20-cv-00035-GKF-CDL

    v.

CHARLES AND LYNN SCHUSTERMAN
FAMILY FOUNDATION;
SANFORD CARDIN;
LISA EISEN;
LYNN SCHUSTERMAN;
ONEDAY SOCIAL VOLUNTEERING;
ELAD BLUMENTAL,

        *Defendants*.

## <u>FIRST AMENDED COMPLAINT</u>

      Plaintiff JCorps International, Inc. ("JCorps") brings this First Amended Complaint against Defendant the Charles and Lynn Schusterman Family Foundation ("Schusterman"), Defendant Sanford Cardin ("Cardin"), Defendant Lisa Eisen ("Eisen"), Defendant Lynn Schusterman ("Lynn Schusterman"), Defendant OneDay Social Volunteering ("OneDay"), and Defendant Elad Blumental ("Blumental"), and alleges as follows:

## <u>INTRODUCTION</u>

    1.    This action is brought to remedy the unlawful conduct of Defendants in the misappropriation and retention of JCorps' confidential, proprietary and trade secret information.

2.      JCorps is an award-winning international volunteer organization with thousands of participants. JCorps' innovative approach and substantial accomplishments have been recognized by the White House, considerable press coverage, and numerous philanthropic organizations.

3.      JCorps' success was no accident. In addition to its unifying mission and the dedication of its participants, JCorps' "secret sauce" was a body of trade secrets – confidential, proprietary information, technologies, and other materials developed and used to facilitate JCorps' programs.

4.      These trade secrets encompass a wide range of information, technologies, and other materials including proprietary event coordination, social engagement, and recruiting materials, protocols, and related technologies, confidential participant databases, business and fundraising plans, social media accounts, and content.

5.      Recognizing the value and importance of these trade secrets, JCorps took significant precautions to ensure this information was maintained securely and confidentially. JCorps participants were required to acknowledge JCorps' exclusive ownership of such trade secrets and agree to maintain their confidentiality and not use such trade secrets outside of JCorps.

6.      Unfortunately, one of JCorps' key personnel (Blumental) violated this agreement and misappropriated numerous JCorps' trade secrets to launch a competing organization, virtually indistinguishable from JCorps. Third-party observers have characterized Blumental's activities as a "blatant rip-off" of JCorps.

7.      Disappointing as this revelation was to JCorps, JCorps discovered that Blumental was not acting alone. Rather, his activities were closely coordinated with and supported by a prominent and influential philanthropic foundation – the Charles and Lynn Schusterman Family Foundation ("Schusterman").

8.      This discovery was particularly unnerving considering Schusterman's history and relationship with JCorps.

9.      Beginning in 2009, Schusterman publicly recognized JCorps' success and sought to develop a relationship with its founder, Ari Teman ("Teman").

10.     Numerous Schusterman personnel identified JCorps' ability to attract and retain talented staff members as being particularly notable and unique in the non-profit world.

11.     These Schusterman personnel sought Teman's guidance regarding how such practices might be implemented within the Schusterman organization.

12.     During several discussions, Teman informed Schusterman personnel of the importance of JCorps' internal guidelines which JCorps implemented to preserve the unique, proprietary, confidential nature of JCorps' materials, processes, technology, information, and other items.

13.     Schusterman personnel also maintained regular, ongoing communications with Teman and were informed of numerous developments including JCorps' promotion of Blumental and Blumental's activities on behalf of JCorps.

14.     Thus, Teman was shocked to learn of Schusterman's partnership with Blumental to coordinate and promote activities using JCorps' trade secrets, including JCorps' proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, social media accounts, and content.

15.     Upon information and belief – and in view of their knowledge of JCorps' personnel guidelines, the existence of JCorps' trade secrets, and Blumental's obligation to JCorps – Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman took such actions despite knowing or having reason to know that Blumental was using JCorps' trade secrets in connection with these

activities and that Blumental was obligated to maintain confidentiality of such trade secrets and not to use them for purposes outside JCorps.

16.     Investigation into Blumental's activities has further revealed that he has embezzled and misused property and other resources rightfully belonging to JCorps in order to develop and operate a competing organization.

17.     This misappropriation and exploitation of JCorps' trade secrets, intellectual property, and assets has caused substantial and irreparable harm to JCorps.

18.     JCorps now seeks to hold Defendants accountable, stop them from further exploiting JCorps' trade secrets and converting JCorps' property and assets, and put an immediate halt to the substantial and irreparable harm and damages Defendants have caused, and continue to cause JCorps as a result of their unlawful activities.

## THE PARTIES

19.     JCorps International, Inc. ("JCorps") is a New York corporation having a principal place of business at 106 W. 32nd St., Fl. 2, New York, NY 10011.

20.      Defendant Charles and Lynn Schusterman Family Foundation ("Schusterman") is a foundation having a principal place of business at 110 W. 7th St., Tulsa, OK 74119.

21.     Defendant Sanford Cardin ("Cardin") is an individual having a mailing address at 110 W. 7th St., Tulsa, OK 74119. Upon information and belief, Cardin is the President of the Charles and Lynn Schusterman Family Foundation.

22.     Defendant Lisa Eisen ("Eisen") is an individual having a mailing address at 9416 Duford Court, Potomac, MD 29854. Upon information and belief, Eisen is the Vice President of the Charles and Lynn Schusterman Family Foundation.

23.     Defendant Lynn Schusterman ("Lynn Schusterman") is an individual having a mailing address at 110 W. 7th St., Tulsa, OK 74119. Upon information and belief, Lynn Schusterman is the Founder of the Charles and Lynn Schusterman Family Foundation.

24.     Defendant OneDay Social Volunteering ("OneDay") is an Israeli entity having a mailing address at 1 Natan Alterman St., Raanana, Israel 4323103.

25.     Defendant Elad Blumental ("Blumental") is an individual having a mailing address at 1 Natan Alterman St., Raanana, Israel 4323103. Upon information and belief, Blumental presents himself as the "CEO and Founder" of OneDay.


## JURISDICTION AND VENUE

26.     This court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. There is complete diversity of citizenship between JCorps and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     This court also has subject matter jurisdiction under 28 U.S.C. § 1331 in that this case arises under various federal statutes, including 18 U.S.C. § 1836 *et seq.*, 18 U.S.C. § 2701 *et seq.*, and 18 U.S.C. § 1030, and its state law claims are part of the same case or controversy.

28.     This Court has supplemental jurisdiction over all causes of action asserted herein, pursuant to 28 U.S.C. § 1367.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial district.

## **FACTUAL BACKGROUND**

### *JCorps' Founding and Development*

30.     As a young entrepreneur in New York City with a passion for volunteering, Ari Teman ("Teman") couldn't understand why few of his peers were involved in volunteer causes.

31.     After surveying numerous local and national volunteer organizations, Teman identified numerous shortcoming he believed were the source of such disinterest.

32.     Believing "there has to be a better way," in 2006 Teman founded JCorps in New York as a volunteer organization focused on engaging young Jewish adults.

33.     From 2006-2013, in addition to operating several other successful businesses, Teman invested 40+ hours a week as a volunteer to build and operate JCorps.

34.     During this time, Teman also invested tens of thousands of dollars in personal funds to support JCorps and its ongoing activities.

35.     Despite commanding significant wages as a technology and non-profit consultant, Teman never accepted a salary or any other form of compensation from JCorps.

36.     Teman continues to devote significant time and resources towards JCorps' ongoing activities.

37.     Dozens of other staff members have also volunteered their time, efforts, talents, and resources to build JCorps.

### *JCorps Reimagines and Redefines Volunteering*

38.     Based on his research and observations, Teman identified several areas in which existing volunteering opportunities were unappealing to young adults.

39.     For example, many young adults juggled busy weekly schedules that left little time to socialize. On weekends, most young adults prioritized social events (e.g., parties, communal events, etc.) over other meaningful activities.

40.     Teman also observed that when deciding from several possible activities, young adults gravitated towards activities known to attract popular, accomplished participants.

41.     Additionally, Teman discovered that many young adults related to volunteering as sacrifice, not an experience that can be socially, professionally, and personally beneficial.

42.     To address these (and other) shortcomings, Teman invented, developed, and refined 'social volunteering,' a revolutionary approach that sought to make volunteering relevant and engaging to socially-minded young adults.

**_Teman Develops a Body of Trade Secrets Reflecting JCorps' Unique 'Social Volunteering' Approach_**

43.     With the goal of revolutionizing the world of volunteering, Teman developed 'social volunteering' as a multi-faceted approach that leveraged proprietary methods, materials, protocols, procedures, plans, technologies, content, and other items.

44.     For example, Teman developed and refined internal proprietary materials, protocols, processes, and related technologies that defined unique approaches for organizing and running socially engaging volunteer events.

45.     These proprietary materials, protocols, processes, and technologies provided JCorps' personnel with specific, detailed guidance – developed over hundreds of events and thousands of hours of research and effort - regarding the manner in which volunteer events and experiences could be successfully organized and coordinated.

7

46.     For example, JCorps' proprietary materials, protocols, and processes provided specific, detailed guidance regarding the use of social media to organize a volunteering event, techniques for attracting participants to an event, and the types of programming that should/should not be utilized in order to ensure the success of an event.

47.     JCorps also developed and maintained internal proprietary materials, protocols, processes, and related technologies that collectively define unique, proprietary approaches for identifying and recruiting participants for various volunteer activities. Such materials, protocols, processes, and technologies – including JCorps' proprietary internet-based volunteer management system/platform – were developed and refined based on JCorps' ongoing experiences successfully organizing worldwide volunteer opportunities for tens of thousands of volunteers.

48.     These items were critical to JCorps personnel tasked with coordinating volunteer events. JCorps' proprietary materials, protocols, processes, and technologies enabled its personnel to maximize participant involvement and satisfaction.

49.     For example, JCorps' proprietary materials, protocols, processes, and technologies provided organizers with step-by-step guidance regarding the types of participants to recruit for specific volunteer activities, and techniques for leveraging social contacts and other relationships to enhance volunteer participation. These materials, protocols, processes, and technologies were critical to enable JCorps' personnel to launch JCorps groups or chapters in new cities, recruit participants, and organize successful and rewarding volunteer opportunities that remained consistent with JCorps' mission and the expectations of its participants, partners, and others.

50.     As JCorps grew and flourished, it engaged with tens of thousands of successful, accomplished, and talented young adults. Recognizing the substantial value in the network he was creating, Teman devoted substantial efforts and financial resources to the creation, development,

and maintenance of a proprietary database containing information on JCorps' thousands of participants. Developing such a proprietary database and keeping it up to date required a considerable investment of time and resources by JCorps.

51.    In addition to contact and biographical information, JCorps maintained considerable information on each participant, including their level of engagement with JCorps (including, for example, the participant's history and attendance at prior events) and other organizations, social affiliations, and other non-public information.

52.    As noted, developing and maintaining such a proprietary database reflecting information for thousands of participants required a tremendous investment of time, effort, and resources, by JCorps. Because JCorps' participants were central to its mission and success, JCorps' proprietary participant database was carefully protected by Teman and JCorps' personnel (including by implementing password protection and other security protocols and by imposing confidentiality obligations on JCorps personnel who had access to JCorps' proprietary database), to ensure it was only utilized for the benefit of JCorps.

53.    Because JCorps' participants were central to its mission and success, JCorps' proprietary database held tremendous value to JCorps and maintaining its secrecy and confidentiality was critical for JCorps to maintain the value of the database. JCorps had invested years of efforts and thousands of dollars in developing and maintaining this proprietary database, containing contact and biographical information of many thousands of its participants, as well as considerable non-public information on each participant, including their level of engagement with JCorps (including, for example, the participant's history and attendance at prior events) and other organizations, and other social affiliations, relationships, and other information.

54.     Maintaining the secrecy and confidentiality of this information was critical for JCorps to preserve its value. JCorps used its proprietary participant database to identify, target, and communicate with specific participants JCorps determined (based on the proprietary information JCorps' tracked and maintained) would be likely to be interested or receptive to a particular volunteering opportunity or event. By maintaining the secrecy of this proprietary database and the information it contained (and forbidding JCorps personnel from using it for any purpose outside JCorps), JCorps also developed a reputation among its participants, partners, and other organizations as a leading volunteer organization that consistently organizes and conducts successful volunteering activities with reliable, engaged participants. JCorps participants and partners learned to recognize JCorps' events and activities (which were organized in numerous cities worldwide) as reliably well-staffed volunteering activities at which participants could engage in meaningful volunteering opportunities while engaging socially with others. Additionally, JCorps' participants understood and expected JCorps to maintain privacy of personal information JCorps had collected maintained, and not to share it with outside parties or organizations. JCorps was able to develop such a reputation by maintaining the secrecy and confidentiality of its proprietary participant database, ensuring that other organizations (with different goals, standards, or objectives from JCorps) would not utilize JCorps' techniques or attempt to engage its participants in the same or similar ways.

55.     Because the reliability of JCorps as a volunteering partner (for partnerships with other organizations) and the success of JCorps' events and activities were critical to JCorps' growth and ongoing success, JCorps developed proprietary technologies, protocols, and processes to increase/ensure the reliable participation of all volunteers.

56.     For example, JCorps invested considerable development efforts and financial resources to build, operate, and maintain an internal internet-based volunteer management system/platform.

57.     JCorps invested substantial efforts, time, and financial resources to custom design, build, and operate an internal technology platform configured for the unique needs and challenges associated with organizing successful volunteer opportunities and running a volunteer organization that was rapidly expanding in the U.S. and internationally.

58.     For example, JCorps' proprietary technology platform was developed and configured to notify participants of upcoming relevant volunteer opportunities and commitments. This and other features were implemented by JCorps to ensure JCorps volunteer opportunities were properly staffed and to ensure organizations JCorps partnered with were satisfied with the performance of JCorps' volunteers and continued to seek to partner with JCorps in the future.

59.     JCorps' proprietary technology platform was also configured to track and maintain information regarding JCorps' participants and details of their involvement in JCorps' volunteer activities. JCorps developed and implemented a unique automated notification feature within its proprietary technology platform to ensure its activities and events were consistently staffed with reliable participants whose participation was likely to lead to a successful event (e.g., as determined based on a participant's prior attendance and performance at prior JCorps activitie(s)). This information also held considerable value to JCorps because it enabled JCorps to consistently staff its events and activities with participants JCorps identified as likely to contribute to a successfully volunteering experience. This internal information was proprietary to JCorps and was not known or ascertainable outside of JCorps. And maintaining the secrecy of this information was important and valuable to JCorps because it enabled JCorps to consistently organize and conduct

11

volunteering activities with participants determined to be reliable and likely to contribute to a successful event. Additionally, JCorps' participants understood and expected JCorps to maintain privacy of personal information JCorps had collected maintained, and not to share it with outside parties or organizations.

60.     JCorps' proprietary technology platform also uniquely enabled JCorps to recruit, manage, screen, rank, waitlist, accept, or reject applicants who sought to participate in JCorps' volunteer activities and events. JCorps' proprietary technology platform also enabled JCorps to track the volunteering performance of individual participants over time. This information and insights further enabled JCorps to build teams and expand by identifying relevant candidates for positions such as Team Leader, donors, event planners, and the like.

61.     Additionally, the internal data generated, collected and tracked by JCorps' proprietary technology platform (including JCorps' automated notification feature and participant tracking capabilities) enabled JCorps to plan and prioritize future volunteering opportunities and further enabled JCorps to staff such events and opportunities with participants determined to be most relevant to such opportunities.

62.     JCorps' proprietary technology platform also uniquely enabled JCorps to recruit, manage, screen, rank, waitlist, accept, or reject applicants who sought to participate in JCorps' volunteer activities and events, as well as to recruit, stay in touch with, communicate with, maintain waitlists, automate reminders, send instructions, track reliability, and collect reviews from participants. JCorps' proprietary technology platform also enabled JCorps to track the volunteering performance of individual participants over time. This information and insights further enabled JCorps to build teams and expand by identifying relevant candidates for positions such as Team Leader, donors, event planners, and the like.

63.     Because it was critical for JCorps' to maintain its reputation among its partners as a reliable organizer of volunteer opportunities and its reputation among participants as an organizer of consistently rewarding and socially-engaging volunteer opportunities, JCorps implemented security measures, including password protection, to ensure competing organizations and individuals outside JCorps could not access JCorps' proprietary platform. These security measures (and other precautions JCorps took, such as imposing confidentiality obligations on various personnel) ensured JCorps could protect its investment in its proprietary technologies, materials, and organization. Doing so enabled JCorps to maintain its unique advantage as a leading volunteer organization known for organizing effective, engaging, successful activities and events. By comparison, other volunteer organizations, who lacked JCorps' proprietary databases, technologies, protocols, and materials, could not target relevant, reliable participants, organize successful volunteering opportunities and events, develop partnerships, and rapidly add new chapters and groups worldwide while maintaining consistency with JCorps' mission and goals, in the manner JCorps could.

64.     JCorps' proprietary technologies, protocols, processes, and materials, together with the precautions JCorps took to prevent such items from being used outside JCorps, gave JCorps a unique advantage as a dynamic volunteering organization, and enabled it to rapidly expand internationally and manage numerous events and members efficiently while ensuring consistent experiences and results consistent with JCorps' mission.

65.     JCorps also maintained considerable additional proprietary information and content including confidential, proprietary donor and contact lists containing personal information and contact information associated with noted philanthropists, academics, executives, and high-ranking domestic and foreign government officials.

66.     JCorps' trade secrets also include confidential, proprietary business and fundraising plans, social media accounts, profiles, pages, posting guidelines, related social media content, and printed materials.

67.     Each of the described proprietary items (and others) were developed by JCorps through thousands of hours of efforts and considerable experience.

68.     JCorps also invested substantial financial resources to develop, maintain, and operate its proprietary methods, materials, protocols, procedures, plans, technologies, content, and other items.

69.     These proprietary methods, materials, protocols, procedures, plans, technologies, content, and other items were central to JCorps' operations and success and thus held immense value to JCorps.

70.     The value of these items to JCorps derives from their secrecy. As described above, JCorps competes for volunteers, volunteer opportunities, funding, partnerships, sponsorships, and other opportunities with many other organizations.

71.     JCorps invested years of efforts and many thousands of dollars to develop its proprietary materials, protocols, processes, technologies, lists, accounts, and other items.

72.     The secrecy of these items was critical to enable JCorps to maintain its reputation as a leading organizer of volunteering opportunities, throughout the U.S. and worldwide. For example, the secrecy of JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items described herein provided JCorps with a considerable advantage in identifying and targeting reliable participants for its activities and events, developing and maintaining partnerships with other organizations, developing and maintaining relationships with philanthropists and charitable foundations who desired to support JCorps' activities, and others.

73.     Other volunteer organizations – who did not invest efforts and resources to develop JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items described herein – would gain a considerable advantage by gaining access to JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items described herein. Doing so would provide a competing organization the immediate benefit of JCorps' years of efforts and financial investment.

74.     As noted, none of JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items were available or known to other organizations who were incapable of achieving results or success comparable to that of JCorps.

***Teman Implements Guidelines and Policies to Protect JCorps and Its Trade Secrets***

75.     Recognizing the unique and significant value these proprietary materials, protocols, processes, technologies, lists, accounts, and other items held to JCorps, Teman implemented internal safeguards to protect their secrecy and ensure JCorps' ongoing success.

76.     For example, prior to working with JCorps, each staff member was required to review, acknowledge, and accept a written set of rules and guidelines that governed their work with JCorps.

77.     JCorps' guidelines document the unique, proprietary, and valuable nature of JCorps' trade secrets and other intellectual property.

78.     These guidelines further identify JCorps as the sole owner of its trade secrets and other content and property created in the course of its operations.

79.     The guidelines further require JCorps' personnel to agree never to use JCorps trade secrets or other property for any purpose outside JCorps.

15

80.     JCorps also implemented password protection on its proprietary databases, technology platform, and across its social media accounts.

81.     JCorps' guidelines, password protection techniques, and other measures JCorps took to preserve the secrecy of its proprietary databases, platforms, materials, protocols, processes, technologies, lists, accounts, and other items were necessary to enable JCorps to retain the value it had created in its proprietary techniques and its relationships with participants, donors, and others.

### JCorps Growth, Success, and Achievements

82.     The response to JCorps' 'social volunteering' approach exceeded event Teman's lofty expectations.

83.     Under Teman's leadership, JCorps rapidly expanded across multiple cities, and facilitated opportunities for over 10,000 volunteers representing over 180 universities, 20 countries, and 800 companies.

84.     JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items were central to JCorps' growth and expansion. These items ensured that as JCorps expanded, its ability to organize and conduct effective volunteer opportunities and events remained consistent across JCorps groups in different cities.

85.     On numerous occasions, after participating in a JCorps' event in one city, participants sought to open a JCorps branch or group in another city.

86.     JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items enabled JCorps to effectively manage its growth and expansion. And ensuring the secrecy of such proprietary materials, protocols, processes, technologies, lists, accounts, and other

16

items ensured that JCorps would retain the value of its considerable investment in these items, by requiring that such materials only be used for JCorps' activities, ensuring that such growth continued within JCorps (as opposed to within competing organizations not part of JCorps who had not invested the efforts and resource JCorps had into developing such proprietary materials, protocols, processes, technologies, lists, accounts, and other items).

87.     JCorps' success and impact have been widely recognized and chronicled in over 100 local, national, and international publications.

88.     Teman and JCorps also received numerous awards and other recognition for their pioneering and innovative 'social volunteering' approach.

89.     For example, the Jewish Federations of North America named Teman its first 'Jewish Community Hero' for his work on JCorps. Teman was also named to the New York Jewish Week's prestigious '36 under 36' list.

90.     JCorps' achievements have also been acknowledged by numerous government officials. Teman has made official visits to the White House and Gracie Mansion in recognition of his work for JCorps.

***Defendant Blumental Joins JCorps; Gains Access to Certain Trade Secrets***

91.     Upon information and belief, Defendant Blumental joined JCorps as a volunteer in New York City on or about November 2008.

92.     Defendant Blumental acknowledged and accepted JCorps' guidelines in connection with his role. In doing so, Blumental acknowledged the proprietary and valuable nature of JCorps' trade secrets. Blumental also acknowledged and agreed never to use JCorps' trade secrets or other property for any purpose outside JCorps.

93.     On or about April 12, 2012, Defendant Blumental was promoted as a 'Team Leader' of JCorps.

94.     In his role as a Team Leader, Defendant Blumental was granted limited administrative privileges, including to certain JCorps' social media accounts such as JCorps' Facebook profile/page.

95.     Such administrative privileges included access to certain JCorps' trade secrets including protected participant lists, social media content, and other related information.

96.     In connection with his role as a Team Leader, Defendant Blumental was also granted access to certain JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items.

97.     For example, Teman granted Blumental limited access to certain proprietary JCorps' event coordination, social engagement, and recruiting materials, protocols, and related technologies, including those described above.

98.     Teman advised Blumental that such proprietary JCorps' event coordination, social engagement, and recruiting materials, protocols, and related technologies were JCorps' trade secrets.

99.     Teman also notified Blumental that such proprietary JCorps' event coordination, social engagement, and recruiting materials, protocols, and related technologies were being shared confidentially with Blumental solely for the purpose of using the trade secrets on behalf of JCorps.

100.    Additionally, Teman reminded Blumental of Blumental's agreement to maintain the confidentiality of JCorps' trade secrets on behalf of JCorps.

.

18

*JCorps Establishes Israeli Subsidiary ('JCorps-Israel')*

101.    During April 2012, JCorps began operations in Israel, including by establishing 'JCORPS SOCIAL VOLUNTEERING – ISRAEL LTD' ("JCorps-Israel") as a subsidiary of JCorps.

102.    Defendant Blumental, in his capacity as a 'Team Leader' of JCorps, assisted in registering JCorps-Israel, utilizing JCorps funds and resources to do so.

103.    Upon information and belief, JCorps-Israel was formally registered with the Israeli Corporations Authority on December 10, 2012 as corporation no. 514847730.

104.    Israel corporation no. 514847730 – that is, JCorps-Israel - was established with JCorps funds and resources and has always been the sole and exclusive property of JCorps.

105.    Upon information and belief, Blumental is in possession of organizational documents and other printed materials that are the property of JCorps.

*Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman Recognize Teman and JCorps' Success*

106.    On account of JCorps' success and accolades, beginning in 2009, Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman took a particular interest in JCorps and Teman.

107.    On numerous occasions throughout 2009-2012, Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman invited Teman to participate in conferences and events coordinated by Schusterman including those held in Tarrytown, NY, Israel, and other locations.

108.    On several occasions at the referenced conferences, Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman invited Teman to give lectures, conduct workshops, and provide other training to conference participants, including Schusterman personnel.

109.   On several occasions at the referenced conferences, Schusterman personnel including Cardin and Lynn Schusterman publicly recognized Teman for his efforts and accomplishments in connection with JCorps.

***Defendants Schusterman, Cardin and Eisen Seek Teman's Guidance on Staffing Challenges; Learn of Strict Confidentiality Guidelines Imposed on JCorps' Personnel***

110.   Defendants Schusterman, Cardin, and Eisen also took particular interest in numerous aspects of JCorps' operations, including its hiring and staffing methods, policies, and decisions.

111.   For example, over the course of various email, telephone, and in-person communications and exchanges with Teman from 2009-2013, Defendants Cardin and Eisen and other Schusterman representatives, marveled at JCorps' ability to consistently attract and retain highly qualified and motivated staff and participants on a volunteer basis.

112.   During these exchanges, Cardin and Eisen reflected on the challenges experienced by Schusterman and other non-profit organizations in attracting and retaining qualified personnel, even for paid positions. Cardin and Eisen further expressed their routine disappointment with the performance of various personnel at Schusterman and other non-profit organizations. Cardin and Eisen cited these challenges as motivation for seeking Teman's advice and input regarding JCorps' success in attracting and retaining talented, motivated personnel.

113.   In response, Teman explained to Cardin and Eisen certain qualities he looks for to identify talented applicants and participants. Teman further explained how he had invested heavily in creating and developing JCorps' organizational culture and brand and had instituted strict guidelines for JCorps' personnel to ensure JCorps' continuity and ongoing success.

20

114.    Among the guidelines Teman identified to Cardin and Eisen was the importance that JCorps' personnel be advised of the unique, proprietary, confidential nature of JCorps' materials, processes, technology, etc. and commit to maintain the confidentiality of such items and never to use such items for purposes outside JCorps.

115.    Additionally, over the course of several private meetings conducted at Schusterman's ROI Conferences held in Israel during July 2009 and July 2010, Teman conveyed similar information to Defendant Lynn Schusterman. During the referenced meetings, Teman informed Lynn Schusterman of his substantial efforts in developing JCorps' organizational culture and brand, and the strict guidelines imposed on JCorps' personnel to ensure JCorps' continuity and ongoing success.

*Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman Are Informed of JCorps' Operations, the Formation of JCorps-Israel, and Defendant Blumental's role within JCorps*

116.    During ongoing communications and meetings from 2009-2013, Teman informed Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman of JCorps' initiatives.

117.    These communications included detailed updates regarding JCorps' initiatives in Israel, including the formation and operations of JCorps-Israel.

118.    As noted, Defendants Schusterman, Cardin, and Eisen took particular interest in JCorps' personnel policies and staffing decisions. Over the course of numerous email exchanges, phone calls, and meetings, Defendants Schusterman, Cardin, and Eisen exhibited keen interest in numerous JCorps' staff candidates and remained continuously aware of JCorps' personnel decisions.

119.    Over the course of the referenced communications, Teman informed Defendants Schusterman, Cardin, and Eisen of Defendant Blumental's the role and activities of within JCorps and JCorps-Israel.

**Multiple Third Parties, Including Defendant Schusterman, Express Interest in Acquiring JCorps**

120.    Beginning in 2013, several organizations and entities – including Defendant Schusterman – explored the possibility of acquiring JCorps.

121.    In multiple email and telephone communications during 2013, Defendant Cardin discussed various potential transactions, including the possibility of Schusterman acquiring JCorps or otherwise taking control of certain of its operations. Defendant Cardin was also aware of other entities who expressed interest in such an acquisition.

122.    During these negotiations, Defendants Schusterman and Cardin acknowledged the significant value that had accrued in JCorps on account of Teman's substantial efforts and investment.

123.    During this period, Teman was advised to allow JCorps' non-profit qualification to expire, in order to facilitate such a potential transaction.

**Defendant Blumental Misappropriates JCorps' Trade Secrets and Property (Including the JCorps-Israel Entity) to Operate 'OneDay'**

124.    In 2013 and 2014, unbeknownst to JCorps, Blumental and OneDay participated in the coordination of several volunteering events in the United States.

125.    Upon information and belief, Blumental and OneDay unlawfully used JCorps' trade secret, proprietary, and confidential information (including confidential participant lists and

22

personal information, donor lists, administrative access to and control of social media accounts, confidential business and organizational plans and documents, proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, and content) to facilitate these volunteering events in the United States.

126. For example, upon information and belief, Blumental and OneDay used JCorps' proprietary participant database to identify participants for events OneDay was coordinating, and further used proprietary features and techniques implemented within JCorps' technology platform to target and recruit such participants for OneDay's events.

127. Upon information and belief, on September 23, 2016, the URL 'odsv.org' was registered.

128. On December 12, 2016, Blumental made a presentation regarding OneDay's operations at a public conference. In a public Facebook post the next day (December 13, 2016), Blumental singled out the participation of the Jewish Federations of North America in the conference and noted that he and OneDay were "…doing everything possible to partner with as many organizations and volunteer with as many places as [possible] in the country and world."

129. On or about March 2017, Defendant Blumental launched a website via the URL 'odsv.org' to promote the activities of 'OneDay Social Volunteering.'

130. From its inception, OneDay has defined itself as an "international organization." OneDay's website solicits partnerships with other international organizations and individuals and highlights prominent U.S. and international organizations as its partners/donors, including prospective and actual partners of JCorps such as the Jewish Federation of Los Angeles, the ROI Community, Nefesh B'Nefesh, Google, Defendants the Schusterman Foundation, and The International Fellowship of Christians and Jews.

131.    Upon information and belief, Defendant Blumental unlawfully used and continues to use JCorps' protected trade secret, proprietary, and confidential information (including but not limited to confidential participant lists and personal information, donor lists, administrative access to and control of social media accounts, confidential business and organizational plans and documents, proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, and content) for purposes that do not benefit JCorps, including to facilitate and support OneDay's operations in furtherance of Blumental and OneDay's stated objective to partner with as many international organizations as possible. These operations include soliciting and forming partnerships with international organizations, soliciting donations from international donors, and recruiting international participants to participate in OneDay's programs. Upon information and belief, Blumental and OneDay's activities (in which OneDay presents itself as a carbon-copy of JCorps) have further caused many of JCorps former and actual partners, such as the Jewish Federation of Los Angeles, the ROI Community, Nefesh B'Nefesh, Google, Defendants the Schusterman Foundation, and The International Fellowship of Christians and Jews, and others, to curtail their involvement with JCorps.

132.    Additionally, Defendants Blumental and OneDay publicly acknowledge partnerships they have solicited and formed with U.S.-based organizations including the 'Birthright Israel,' 'Onward Israel,' and 'Da'at Educational Expeditions' organizations. Upon information and belief, Blumental and OneDay have unlawfully used and continue to use JCorps' trade secrets in connection with these and other partnerships.

133.    As a direct and proximate result of Blumental and OneDay's conduct, JCorps has suffered and continues to suffer the loss of partners participants, and donors, as well as difficulties

in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein.

134.   For example, after Blumental and OneDay used JCorps' proprietary participant database to identify participants for events OneDay was coordinating, and further used proprietary features and techniques implemented within JCorps' technology platform to target and recruit such participants for OneDay's events and other operations, numerous JCorps' participants expressed confusion to JCorps' personnel regarding the nature of the relationship between JCorps and OneDay. Additionally, as a result of Blumental and OneDay using JCorps' proprietary participant database and proprietary features and techniques implemented within JCorps' technology platform to identify target and recruit participants for OneDay's events and other operations, JCorps lost numerous participants and other valuable relationships, including, upon information and belief, with Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others.

135.   Additionally, due to OneDay utilizing JCorps' trade secrets to identify and recruit participants (as described herein), many aspects of OneDay's recruitment and organization activities were indistinguishable from JCorps.' As a result of being recruited by OneDay in a substantially identical manner to the manner in which JCorps had recruited and engaged with these participants, JCorps participants expressed disappointment with JCorps and curtailed or stopped their relationship with, support of, and/or participation in JCorps.

136.   Defendants Blumental and OneDay also publicly acknowledge they have recruited participants through partnerships Blumental and OneDay formed with the referenced U.S.-based organizations. Upon information and belief, Blumental and OneDay have unlawfully used and

continue to use JCorps' trade secrets to identify, target, and recruit such individuals to participate in OneDay's programs.

137.    Additionally, the referenced partnerships solicited and formed by Blumental and OneDay are directed exclusively towards JCorps' target demographic – young Jewish adults. Through their experiences and interactions with JCorps, Blumental and OneDay knew that this demographic is concentrated heavily in the U.S. and Israel and, in many instances, participants traveled regularly between them.

138.    By virtue of their lengthy and ongoing relationship with JCorps, Blumental and OneDay had intimate knowledge of JCorps' activities and operations in the U.S. Blumental and OneDay further knew that JCorps' target demographic – young Jewish adults – were concentrated heavily in the U.S. Additionally, Blumental and OneDay were well aware that JCorps' U.S. -based participants were likely be receptive to various forms of engagement initiated by Blumental and OneDay using JCorps' proprietary databases, technologies, and techniques.

139.    Accordingly, when Blumental and OneDay unlawfully used JCorps' trade secrets to solicit and enter into partnerships with U.S.-based organizations, Blumental and OneDay knew or should have reasonably expected that injury to JCorps in the U.S. would be the direct and foreseeable result.

140.    For example, when Blumental and OneDay unlawfully used JCorps' trade secrets to solicit and enter into partnerships with U.S.-based organizations to coordinate activities directed towards JCorps' target demographic, Blumental and OneDay knew or should have reasonably expected that injury to JCorps in the U.S. – including the loss of partners in the U.S., the loss of participants in the U.S., the loss of donors in the U.S., difficulties in recruiting and retaining

participants in the U.S., dilution of its good will in the U.S., injury to its reputation in the U.S., and other injuries described herein - would be the direct and foreseeable result.

141.     By way of further example, when Blumental and OneDay unlawfully used JCorps' trade secrets (including JCorps' proprietary techniques) to identify, target, and recruit participants in the U.S., Blumental and OneDay knew or should have reasonably expected that injury to JCorps in the U.S.– including the loss of partners in the U.S., the loss of participants in the U.S., the loss of donors in the U.S., difficulties in recruiting and retaining participants in the U.S., dilution of its good will in the U.S., injury to its reputation in the U.S., and other injuries described herein - would be the direct and foreseeable result.

142.     After being targeted by OneDay (using JCorps' proprietary databases, technologies, and techniques) regarding OneDay's events and other operations, numerous JCorps' participants in the U.S. expressed confusion to JCorps' personnel regarding the nature of the relationship between JCorps and OneDay. Specifically, due to OneDay utilizing JCorps' trade secrets to identify and recruit participants (as described herein), many aspects of OneDay's recruitment and activities were indistinguishable from JCorps.' As a result of being recruited by OneDay in a substantially identical manner to the manner in which JCorps had recruited these U.S.-based participants, many of these participants expressed disappointment with JCorps and curtailed or stopped their relationship with, support of, and/or participation in JCorps.

143.     Upon information and belief, Defendant Blumental unlawfully used and continues to use property, organizational documents, other printed materials, accounts, assets and other resources of Israeli corporation no. 514847730 – i.e., JCorps-Israel – for purposes that do not benefit JCorps, including to facilitate and support OneDay's operations.

144.    Upon    information    and    belief,    Defendant    OneDay's    website (http://www.odsv.org/donate) unlawfully solicits donations via Israeli corporation no. 514847730 – i.e., JCorps-Israel – for purposes that do not benefit JCorps, including to support OneDay's operations.

***Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman, Blumental, and OneDay Use JCorps' Trade Secrets to Benefit Their Collective Activities***

145.    Upon information and belief, Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman actively participate in, facilitate, and support Defendant Blumental and Defendant OneDay's activities.

146.    For example, both Defendant Schusterman and Defendant OneDay prominently feature Schusterman's financial support of OneDay on their respective websites.

147.    Defendant Schusterman's website also publicizes and promotes Defendant OneDay and Defendant Blumental's activities.

148.    On or about February 5, 2016, Defendant Schusterman and Defendant OneDay jointly orchestrated a Jewish religious ceremony ("Tu B'Shvat Seder").

149.    This ceremony was promoted widely on social media platforms including Facebook.

150.    Upon information and belief, Schusterman and OneDay's Tu B'Shvat Seder was planned, organized, and conducted using JCorps' Trade Secrets, including JCorps' proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, social media accounts, and content.

28

151.    For example, upon information and belief, Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, sought and obtained from Blumental access to JCorps' trade secrets including JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items.

152.    For example, upon information and belief, Defendant Schusterman participated in the planning, organizing, and/or orchestrating of the Tu B'Shvat Seder and did so using JCorps' proprietary participant database (which Defendant Schusterman obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to maintain its confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Tu B'Shvat Seder. Additionally, upon information and belief, Defendant Schusterman further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Schusterman obtained from Blumental knowing they were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features,  to target and recruit JCorps' participants for the Tu B'Shvat Seder.

153.    By way of further example, upon information and belief, Defendant Cardin participated in the planning, organizing, and/or orchestrating of the Tu B'Shvat Seder and did so using JCorps' proprietary participant database (which Defendant Cardin obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to maintain its confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Tu B'Shvat

Seder. Additionally, upon information and belief, Defendant Cardin further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Cardin obtained from Blumental knowing they were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features, to target and recruit JCorps' participants for the Tu B'Shvat Seder.

154. By way of further example, upon information and belief, Defendant Eisen participated in the planning, organizing, and/or orchestrating of the Tu B'Shvat Seder and did so using JCorps' proprietary participant database (which Defendant Eisen obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to maintain its confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Tu B'Shvat Seder. Additionally, upon information and belief, Defendant Eisen further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Eisen obtained from Blumental knowing they were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features, to target and recruit JCorps' participants for the Tu B'Shvat Seder.

155. By way of further example, upon information and belief, Defendant Lynn Schusterman participated in the planning, organizing, and/or orchestrating of the Tu B'Shvat Seder and did so using JCorps' proprietary participant database (which Defendant Lynn Schusterman obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to

30

maintain its confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Tu B'Shvat Seder. Additionally, upon information and belief, Defendant Lynn Schusterman further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Lynn Schusterman obtained from Blumental knowing they were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features,  to target and recruit JCorps' participants for the Tu B'Shvat Seder.

156.    As described herein, Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay unlawfully used JCorps' trade secrets to identify, target, and recruit JCorps' participants to participate in or otherwise support Schusterman and OneDay's Tu B'Shvat Seder.

157.    Schusterman and OneDay's Tu B'Shvat Seder was directed towards JCorps' target demographic – young Jewish adults. Through their experiences and interactions with JCorps, each of Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay knew that this demographic is concentrated heavily in the U.S. and Israel and, in many instances, participants traveled regularly between them.

158.    By virtue of their lengthy and ongoing relationship with JCorps, each of Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay had intimate knowledge of JCorps' activities and operations. Each of the Defendants further knew that JCorps' target demographic – young Jewish adults – were concentrated heavily in the U.S. and Israel and, in many instances, traveled regularly between them. Additionally, each of the Defendants were well

aware that JCorps' participants would likely be receptive to various forms of engagement initiated by the Defendants using JCorps' proprietary techniques.

159.    Accordingly, when each of the Defendants unlawfully used JCorps' trade secrets to identify, target, and recruit JCorps' participants to participate in or otherwise support Schusterman and OneDay's Tu B'Shvat Seder, each of the Defendants knew or should have reasonably expected that injury to JCorps would be the direct and foreseeable result.

160.    For example, when each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman unlawfully used JCorps' trade secrets to identify, target, and recruit JCorps' participants to participate in or otherwise support the Tu B'Shvat Seder, Schusterman, Cardin, Eisen, and Lynn Schusterman each knew or should have reasonably expected that injury to JCorps – including the loss of participants, difficulties in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein - would be the direct and foreseeable result.

161.    After being targeted by social media and other content from Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay regarding the Tu B'Shvat Seder, numerous JCorps' participants expressed confusion to JCorps' personnel regarding the nature of the relationship between JCorps and OneDay. Specifically, due to each of the Defendants utilizing JCorps' trade secrets to identify, target, and recruit participants and supporters (as described herein) for the Tu B'Shvat Seder, many aspects of the Defendants' recruitment and solicitation activities were indistinguishable from JCorps.' Upon information and belief, as a result of being recruited and solicited by the Defendants for the Tu B'Shvat Seder in a substantially identical manner to the manner in which JCorps had recruited its participants, many JCorps

participants expressed disappointment with JCorps (fearing JCorps was no longer committed to its mission) and curtailed or stopped their relationship with, support of, and/or participation in JCorps.

162.    As a direct and proximate result of each Defendants' conduct, JCorps has suffered and continues to suffer the loss of participants (including, upon information and belief, Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others), the loss of donors and partnership opportunities (including, upon information and belief, with the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews, and others), difficulties in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein.

163.    As described above, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman also solicited and obtained JCorps' trade secrets from Blumental in connection with the Tu B'Shvat Seder, including JCorps' proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, social media accounts, and content, and further used such trade secrets to target and recruit JCorps' participants for the Tu B'Shvat Seder, as described above.

164.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman took such actions despite knowing or having reason to know that Blumental was unlawfully using JCorps' trade secrets in connection with these activities and that Blumental was obligated to maintain confidentiality of such trade secrets and not to use them for purposes outside JCorps.

165.    Upon information and belief, on or about February, 2017, Defendant Schusterman and Defendant OneDay jointly planned and orchestrated a leadership seminar pertaining to volunteering (the "Leadership Seminar").

166.    Upon information and belief, Schusterman and OneDay's Leadership Seminar was planned, organized, and conducted using JCorps' Trade Secrets including JCorps' proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, social media accounts, and content. For example, upon information and belief, Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay each unlawfully used JCorps' trade secrets to identify and target JCorps' participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate in and support Schusterman and OneDay's Leadership Seminar.

167.    Upon information and belief, Schusterman and OneDay's Leadership Seminar was planned, organized, and conducted using JCorps' Trade Secrets, including JCorps' proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, social media accounts, and content.

168.    For example, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, sought and obtained from Blumental access to JCorps' trade secrets including JCorps' proprietary materials, protocols, processes, technologies, lists, accounts, and other items.

169.    For example, upon information and belief, Defendant Schusterman participated in the planning, organizing, and/or orchestrating of the Leadership Seminar and did so using JCorps' proprietary participant database (which Defendant Schusterman obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to maintain its

confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Leadership Seminar. Additionally, upon information and belief, Defendant Schusterman further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Schusterman obtained from Blumental knowing they were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features,  to target and recruit JCorps' participants for the Leadership Seminar.

170.    By way of further example, upon information and belief, Defendant Cardin participated in the planning, organizing, and/or orchestrating of the Leadership Seminar and did so using JCorps' proprietary participant database (which Defendant Cardin obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to maintain its confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Leadership Seminar. Additionally, upon information and belief, Defendant Cardin further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Cardin obtained from Blumental knowing they were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features,  to target and recruit JCorps' participants for the Leadership Seminar.

171.   By way of further example, upon information and belief, Defendant Eisen participated in the planning, organizing, and/or orchestrating of the Leadership Seminar and did so using JCorps' proprietary participant database (which Defendant Eisen obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to maintain its confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Leadership Seminar. Additionally, upon information and belief, Defendant Eisen further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Eisen obtained from Blumental knowing they were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features, to target and recruit JCorps' participants for the Leadership Seminar.

172.   By way of further example, upon information and belief, Defendant Lynn Schusterman participated in the planning, organizing, and/or orchestrating of the Leadership Seminar and did so using JCorps' proprietary participant database (which Defendant Lynn Schusterman obtained from Blumental knowing it was JCorps' trade secret and that Blumental was obligated to maintain its confidentiality and not use it for purposes outside JCorps) to identify, target, and recruit JCorps participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate, support, and promote the Leadership Seminar. Additionally, upon information and belief, Defendant Lynn Schusterman further used proprietary features and techniques implemented within JCorps' technology platform (which Defendant Lynn Schusterman obtained from Blumental knowing they

36

were JCorps' trade secrets and that Blumental was obligated to maintain their confidentiality and not use them for purposes outside JCorps), including JCorps' participant recruitment, automated notification, and participant tracking features,  to target and recruit JCorps' participants for the Leadership Seminar.

173.    As described herein, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay unlawfully used JCorps' trade secrets to identify, target, and recruit JCorps' participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) to participate in or otherwise support Schusterman and OneDay's Leadership Seminar.

174.    Schusterman and OneDay's Leadership Seminar was directed towards JCorps' target demographic – young Jewish adults. Through their experiences and interactions with JCorps, each of Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay knew that this demographic is concentrated in the U.S. and Israel and, in many instances, participants traveled regularly between them.

175.    By virtue of their lengthy and ongoing relationship with JCorps, each of Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental and OneDay had intimate knowledge of JCorps' activities and operations. Each of the Defendants further knew that JCorps' target demographic – young Jewish adults – were concentrated heavily in the U.S. and Israel and, in many instances, traveled regularly between them. Additionally, each of the Defendants were well aware that JCorps' participants would likely be receptive to various forms of engagement initiated by each of the Defendants using JCorps' proprietary techniques.

176.    Accordingly, when each of the Defendants unlawfully used JCorps' trade secrets to identify and target JCorps' participants to support Schusterman and OneDay's Leadership

37

Seminar, each of the Defendants knew or should have reasonably expected that injury to JCorps would be the direct and foreseeable result.

177.   For example, when each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental, and OneDay unlawfully used JCorps' trade secrets to identify and target JCorps' participants to participate in and support the Leadership Seminar, each of the Defendants knew or should have reasonably expected that injury to JCorps – including the loss of participants (including, upon information and belief, Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others), the loss of donors and partnership opportunities (including, upon information and belief, with the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews, and others), difficulties in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein - would be the direct and foreseeable result.

178.   Upon information and belief, after being targeted by each of the Defendants regarding the Leadership Seminar, numerous JCorps' participants in the U.S. were confused regarding the nature of the relationship between JCorps and OneDay. Specifically, due to the Defendants utilizing JCorps' trade secrets to identify and target JCorps participants (as described herein), many aspects of the Defendants' activities were indistinguishable from JCorps.' Upon information and belief, as a result of being solicited by the Defendants in a substantially identical manner to the manner in which JCorps had recruited these participants, many of these participants were disappointed with JCorps (fearing JCorps was no longer committed to its mission) and curtailed or stopped their relationship with, support of, and/or participation in JCorps.

179.     As a direct and proximate result of each Defendants' conduct, JCorps has suffered and continues to suffer the loss of participants (including, upon information and belief, Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others), the loss of donors and partnership opportunities (including, upon information and belief, with the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews, and others), difficulties in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein.

180.     As described above, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman also solicited and obtained JCorps' trade secrets from Blumental in connection with the Leadership Seminar.

181.     Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman took such actions despite knowing or having reason to know that Blumental was using JCorps' trade secrets in connection with these activities and that Blumental was obligated to maintain confidentiality of such trade secrets and not to use them for purposes outside JCorps.

182.     Upon information and belief, Defendant Schusterman actively trains and promotes the activities of Defendant Blumental and Defendant OneDay.

183.     For example, Schusterman's website prominently features Blumental as a member of the 'ROI Community' (one of Schusterman's "Signature Initiatives").

184.     Various philanthropy-related media outlets have also highlighted Blumental's participation in Schusterman's 2017 'ROI Summit' and other activities and events.

185.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman solicited and obtained JCorps' trade secrets from Blumental, including JCorps' proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, social media accounts, and content, and further used such trade secrets to target and recruit JCorps' participants (including those JCorps' proprietary database and platform reflected were likely to be receptive to or interested in such activities) in connection with the 2017 'ROI Summit' conducted in early July 2017.

186.    Only weeks after participating in the ROI Summit, Blumental and OneDay publicly announced partnerships with several organizations, including Birthright Israel and Onward Israel. Both Birthright Israel and Onward Israel have close ties to Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman.

187.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental, and OneDay utilized JCorps' trade secrets to collectively facilitate partnerships between OneDay and Birthright Israel/Onward Israel. Specifically, the Defendants utilized JCorps' trade secrets to facilitate partnerships through which OneDay and Blumental would coordinate activities directed towards young Jewish adults - JCorps' target demographic.

188.    By virtue of their lengthy and ongoing relationship with JCorps, each of the Defendants had intimate knowledge of JCorps' activities and operations. The Defendants further knew that JCorps' target demographic – young Jewish adults – were concentrated heavily in the U.S. and Israel and, in many instances, traveled regularly between them. Additionally, each of the Defendants were well aware that JCorps' participants would likely be receptive to various forms of engagement initiated by Defendants using JCorps' proprietary techniques.

189.     Accordingly, when Defendants Schusterman, Cardin, Eisen and Lynn Schusterman coordinated with Blumental and OneDay to unlawfully use JCorps' trade secrets to facilitate partnerships with various U.S.-based organizations, each of the Defendants knew or should have reasonably expected that injury to JCorps in the U.S. would be the direct and foreseeable result.

190.     For example, when Defendants Schusterman, Cardin, Eisen and Lynn Schusterman unlawfully used JCorps' trade secrets to facilitate partnerships between OneDay and various U.S.-based organizations to coordinate activities directed towards JCorps' participants, each of the Defendants knew or should have reasonably expected that injury to JCorps – including the loss of participants (including, upon information and belief, Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others), the loss of donors and partnership opportunities (including, upon information and belief, with the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews), difficulties in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein - would be the direct and foreseeable result.

191.     Upon information and belief, Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman took such actions despite knowing or having reason to know that Blumental was using JCorps' trade secrets in connection with these activities and that Blumental was obligated to maintain confidentiality of such trade secrets and not to use them for purposes outside JCorps.

***Defendants Schusterman, Blumental, and OneDay Misappropriate JCorps' Trade Secrets and Property to Benefit the Partnership Between Schusterman, Blumental, and OneDay***

192.     Upon information and belief, each of Defendants Schusterman, Blumental, and OneDay unlawfully misappropriated JCorps' protected trade secret, proprietary, and confidential

41

information (including but not limited to confidential JCorps' proprietary participant databases, event coordination and social engagement materials, protocols, and technologies, social media accounts, and content) in furtherance of the above referenced and other activities.

193.    Upon information and belief, Defendants Schusterman, Blumental, and OneDay unlawfully used and continue to use property and assets of JCorps, including Israeli corporation no. 514847730 – i.e., JCorps-Israel – and its assets, accounts, organizational documents and other printed materials, and other resources, in furtherance of the above referenced and other activities.

194.    For example, upon information and belief, Defendant Schusterman has provided financial support to Blumental and OneDay by transferring funds via accounts associate with Israeli corporation no. 514847730 – i.e., JCorps-Israel. By way of further example, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental, and OneDay have used printed materials which are the property of JCorps to benefit Defendants' activities, including by using and/or distributing such printed materials at the Tu B'Shvat Seder, the Leadership Seminar, and the ROI Summit.

195.    Upon information and belief, Defendant Schusterman has taken the above actions despite knowing of Defendant Blumental's role within and activities on behalf of JCorps.

196.    Upon information and belief, Defendant Schusterman has taken the above actions despite knowing that Defendants Blumental and OneDay were and are misappropriating trade secrets and confidential information of JCorps.

197.    Upon information and belief, Defendant Schusterman has taken the above actions despite knowing that Israeli corporation no. 514847730 – i.e., JCorps-Israel – was the exclusive property of JCorps.

198.    Upon information and belief, Defendant Schusterman has taken the above actions despite knowing that Defendants Blumental and OneDay were using Israeli corporation no. 514847730 – i.e., JCorps-Israel – and its assets, accounts, and other resources in an unauthorized and unlawful manner, including to support OneDay's operations.

199.    Upon information and belief, Defendant Schusterman utilizes its website to actively solicit donations to Defendants Blumental and OneDay via Israeli corporation no. 514847730 – i.e., JCorps-Israel – despite knowing that JCorps-Israel and its assets, accounts, and other resources are the exclusive property of JCorps and that Defendants Blumental and OneDay activities are unauthorized and unlawful.

**Defendant Blumental 'Hacks' JCorps' Social Media Accounts Containing JCorps' Trade Secrets**

200.    Upon information and belief, on or about February 6, 2018, Defendant Blumental gained unauthorized access to JCorps' social media accounts and profiles, including JCorps' account and profile on the LinkedIn social network.

201.    In a sequence of correspondence beginning February 8, 2018, representatives from LinkedIn Corporation confirmed that Defendant Blumental took unauthorized control of JCorps' LinkedIn account and profile.

202.    JCorps' account and profile on LinkedIn contained trade secrets including confidential participant lists and personal information, confidential donor and contact lists and personal information, confidential business and fundraising plans, and related information.

203.    Upon information and belief, Defendants Blumental and OneDay used the trade secrets they unlawfully obtained by "hacking" JCorps' social media accounts to solicit and enter into partnerships with organizations to coordinate activities directed towards JCorps' participants.

43

204.    For example, shortly after "hacking" JCorps' social media accounts, Blumental and OneDay announced and promoted a volunteering event on July 29, 2018 for young Jewish adults from America.  Blumental and OneDay coordinated this event in partnership with "Onward Israel," a U.S.-based organization.

205.    Upon information and belief, Blumental and OneDay unlawfully used JCorps' trade secrets – including additional, up-to-date trade secrets obtained by Blumental and OneDay during their "hack" of JCorps' social media accounts - to facilitate these events.

206.    By way of further example, shortly after "hacking" JCorps' social media accounts, Blumental and OneDay announced and promoted volunteering initiatives for young Jewish adults from America in partnership with "'Da'at Educational Expeditions" a U.S.-based organization. In a public interview discussing this partnership (dated November 22, 2018) Blumental described OneDay's efforts to "…bring[] American missions and groups…to volunteer."

207.    Upon information and belief, Blumental and OneDay unlawfully used JCorps' trade secrets – including JCorps' proprietary participant databases, technology platform, and additional, up-to-date trade secrets obtained by Blumental and OneDay during their "hack" of JCorps' social media accounts - to facilitate these events.

208.    By virtue of their lengthy and ongoing relationship with JCorps, Blumental and OneDay had intimate knowledge of JCorps' activities and operations. Blumental and OneDay further knew that JCorps' participants were concentrated in the U.S.  and Israel and, in many instances, traveled regularly between them. Additionally, Blumental and OneDay were well aware that JCorps' participants would likely be receptive to various forms of engagement initiated by Blumental and OneDay using JCorps' proprietary techniques.

209.    Additionally, by virtue of their lengthy and ongoing relationship with JCorps, Blumental and OneDay had intimate knowledge of the importance JCorps' placed on its trade secrets, including its technology platform, social media accounts and proprietary participant lists and databases. Specifically, Blumental and OneDay knew how valuable these platforms, accounts, lists, and databases were to JCorps, and how the ongoing confidentiality of these trade secrets were critical to JCorps' ongoing operations and success.

210.    Accordingly, when Blumental and OneDay "hacked" JCorps' social media accounts and unlawfully used JCorps' trade secrets obtained through their hacking to solicit and enter into partnerships with U.S.-based organizations, Blumental and OneDay knew or should have reasonably expected that injury to JCorps in the U.S. would be the direct and foreseeable result.

211.    For example, when Blumental and OneDay unlawfully used JCorps' trade secrets to solicit and enter into partnerships with U.S.-based organizations to coordinate activities directed towards JCorps' participants, Blumental and OneDay knew or should have reasonably expected that injury to JCorps in the U.S. – including the loss of partners, the loss of participants, the loss of donors, difficulties in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein - would be the direct and foreseeable result.

212.    By way of further example, when Blumental and OneDay "hacked" into JCorps' social media accounts and accessed its proprietary participant lists, and databases, Blumental and OneDay knew or should have reasonably expected that this breach of confidentiality itself would cause injury to JCorps in the U.S. Blumental and OneDay had direct, actual knowledge of JCorps' policies and how critical the confidentiality of these trade secrets was to JCorps' ongoing operations and success. By breaching this confidentiality when "hacking" JCorps' accounts, Blumental and OneDay knowingly cause injury to JCorps.

213.    Additionally, promotional materials disseminated in connection with the volunteering event coordinated by Blumental and OneDay in partnership with Onward Israel identify OneDay as a "content provider" for Onward Israel, a U.S.-based organization.

214.    Upon information and belief, in serving as a "content provider" for Onward Israel, Blumental and OneDay contracted with Onward Israel and received payment for the content and services provided to Onward Israel.

215.    Upon information and belief, Blumental and OneDay have similarly contracted with and received payment for services provided to other U.S.-based organizations including 'Da'at Educational Expeditions' and 'Birthright Israel,' as described herein.

216.    As a direct and proximate result of Blumental and OneDay's conduct, JCorps has suffered and continues to suffer the loss of participants (including, upon information and belief, Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others), the loss of donors and partnership opportunities (including, upon information and belief, with the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews, and others), difficulties in recruiting and retaining participants, dilution of its good will, injury to its reputation, and other injuries described herein.

## CAUSES OF ACTION

### COUNT I

**TRADE SECRET MISAPPROPRIATION UNDER
THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq*.)**

217.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

46

218.    At all relevant times, JCorps owned and possessed certain confidential, proprietary and trade secret information as alleged above, including but not limited to participant lists and personal information, donor and contact lists and personal information, administrative access to and control of social media accounts, business and fundraising plans, internal policies, procedures, and planning materials, proprietary participant databases, event coordination and social engagement materials, protocols, and technologies,  and content.

219.    Confidential participant lists and personal information, donor and contact lists and personal information, administrative access to and control of social media accounts, business and fundraising plans, internal policies, procedures, and planning materials, proprietary participant databases, event coordination and social engagement materials, protocols, and technologies,  and content, and related information constitute legally-recognized trade secrets and proprietary and confidential information protected under federal law, and more particularly the Defend Trade Secrets Act, as defined under 18 U.S.C. § 1839(3).

220.    Such confidential, proprietary and trade secret information relate to JCorps' services which are used in, or intended for use in, interstate or foreign commerce.

221.    JCorps has taken reasonable measures to keep such information secret and confidential, including maintaining such information on secure computer systems to assure it is not discoverable by or disseminated to the general public; implementing password protection; limiting access to such information to key personnel; imposing confidentiality obligations on JCorps' personnel; and periodically monitoring communication systems to prevent dissemination.

222.    JCorps' trade secrets, including its proprietary participant database and technology platform, held tremendous value to JCorps. JCorps invested years of efforts and thousands of dollars in developing, refining, and maintaining these (and other) trade secrets.

223.    Such confidential, proprietary and trade secret information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of such information. As described herein, JCorps' trade secrets hold considerable economic value to JCorps and are not known or ascertainable outside of JCorps. Maintaining the secrecy of this information is critical to JCorps.

224.    Defendant Blumental's brazen hacking of JCorps' social media accounts in February 2018 further demonstrates the significant value inherent in JCorps' trade secrets and how such trade secrets cannot be obtained through legal means.

225.    In violation of JCorps' rights, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental, and OneDay misappropriated such confidential, proprietary and trade secret information in the improper and unlawful manner as alleged above.

226.    At the time that JCorps' confidential, proprietary and trade secret information was disclosed to Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, and Blumental, each of the Defendants knew or had reason to know that the trade secret was protected confidential, proprietary information having significant economic value to JCorps and giving rise to a duty to maintain the secrecy of JCorps' trade secrets.

227.    At the time that Defendant Blumental disclosed JCorps' confidential, proprietary and trade secret information to each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman, Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman knew or had reason to know that the trade secrets were acquired through improper and unlawful means, under circumstances giving rise to a duty to maintain the secrecy of JCorps' trade secrets.

228.    At the time that each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman used JCorps' confidential, proprietary and trade secret information, each of these defendants  knew or had reason to know that the trade secrets were acquired through improper and unlawful means, under circumstances giving rise to a duty to maintain the secrecy of JCorps' trade secrets.

229.    As a direct and proximate result of each of the Defendants' conduct, JCorps has suffered and continues to suffer the disruption of its operations and the loss of participants and potential participants, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

230.    Each of Defendants' misappropriation of JCorps' confidential information and trade secrets has caused and will continue to cause JCorps substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Defendants have been unjustly enriched by their misappropriation of JCorps' confidential information and trade secrets.

231.    Each of Defendants' misappropriation of JCorps' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

232.    Because JCorps' remedy at law is inadequate, JCorps seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade secrets as well as JCorps' legitimate business interests. JCorps will continue to suffer irreparable harm absent injunctive relief.

## COUNT II

## VIOLATION OF THE OKLAHOMA UNIFORM
## TRADE SECRETS ACT,78 O.S. §§ 85 *et seq*.,

233.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

234.    The rights and interests of JCorps in its confidential information, described above, constitute trade secrets as defined by the common law of the State of Oklahoma.

235.    JCorps owns the rights, title and interest in and to the trade secrets that each Defendant used and continue to use in developing, promoting, and operating OneDay, the Tu B'Shvat Seder, the Leadership Seminar, the ROI Summit, and other activities.

236.    Because of JCorps' reliance on the confidentiality provisions in the JCorps guidelines as accepted by Blumental (and in view of Defendants' additional assurances), JCorps provided Blumental with access to and knowledge of JCorps' trade secrets and confidential information including JCorps' participant lists and personal information, donor and contact lists and personal information, administrative access to and control of social media accounts, business and fundraising plans, internal policies, procedures, and planning materials, proprietary participant databases, event coordination and social engagement materials, protocols, and technologies,  and content.

237.    Such trade secrets were and are primary assets of JCorps and have actual and potential independent economic value for JCorps. JCorps has carefully guarded its trade secret information and has taken reasonable steps to maintain its secrecy. There has been no disclosure of the trade secrets and confidential information by JCorps.

238.    Each of the Defendants had knowledge that JCorps regarded the trade secret information as trade secrets and of their legal obligation and duty, by virtue of the JCorps guidelines and rules and other assurances, to preserve the confidentiality of JCorps' trade secrets and confidential information and to limit their use.

239.    Upon information and belief, Blumental knowingly, willfully and maliciously violated the JCorps guidelines and rules and the referenced assurances and breached JCorps' confidence by misappropriating JCorps' trade secrets in order to develop, promote, and facilitate OneDay. Additionally, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, and OneDay obtained JCorps' trade secrets from Blumental with knowledge of Blumental's confidentiality obligations to JCorps, and further used such trade secrets to benefit Defendants' activities (including organizing and conducting the Tu B'Shvat Seder, Leadership Seminar, ROI Summit, and other activities).

240.    As a direct and proximate result of each of Defendants' conduct, JCorps has suffered and continues to suffer the disruption of its operations and the loss of participants and potential participants and partners, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

241.    Each of Defendants' misappropriation of JCorps' confidential information and trade secrets has caused and will continue to cause JCorps substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Each of Defendants have been unjustly enriched by their misappropriation of JCorps' confidential information and trade secrets.

242.    Each of Defendants' misappropriation of JCorps' trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

243.    Because JCorps' remedy at law is inadequate, JCorps seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade secrets as

well as JCorps' legitimate business interests. JCorps will continue to suffer irreparable harm absent injunctive relief.

## COUNT III

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 *et seq*.) (AS TO DEFENDANTS BLUMENTAL AND ONEDAY)

244.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

245.    JCorps' computers, servers, social media accounts, profiles, and pages are involved in interstate and foreign commerce and communication and are protected computers under 18 U.S.C. § 1030(e)(2).

246.    Upon information and belief, Defendant Blumental knowingly and intentionally accessed JCorps' servers, social media accounts, profiles, and pages without authorization or in excess of authorization, and thereby obtained and used valuable information from those computers, in violation of 18 U.S.C. § 1030(a)(2)(C). Such information included but was not limited to: participant lists, donor and contact lists, contact information, personal information, private and sensitive communications, confidential internal documents, and other information.

247.    Upon information and belief, Defendant Blumental intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. § 1030(a)(5)(C), or recklessly caused damage in violation of 18 U.S.C. § 1030(a)(5)(B).

248.    Defendants cause loss to one or more persons during a one-year period aggregating well over $5,000 in value, and they also cause damage affecting ten or more protected computers during a one-year period.

52

249.     JCorps suffered damage and loss as a consequence of Defendants' actions, including but not limited to the cost of investigating and responding to unauthorized access and abuse of their computers and accounts, conducting damage assessments, restoring and replacing computers and data, programs, systems, or information, the loss of the value of JCorps' trade secrets, and the harm to JCorps' business operations as described above. JCorps seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g).


**COUNT IV**

**VIOLATION OF THE STORED COMMUNICATIONS ACT (18 U.S.C. § 2701 *et seq.*) (AS TO DEFENDANTS BLUMENTAL AND ONEDAY)**

250.     JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

251.     Plaintiff is a "person" within the meaning of 18 U.S.C. § 2501(6) and 2707(a).

252.     Defendants Blumental and OneDay willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely JCorps' computer systems, servers, social media accounts, profiles, and pages, thereby obtaining access to wire or electronic communication while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

253.     As a result of these willful and intentional violations, Plaintiff has suffered damages and, as provided for in 18 U.S.C. § 2707, seeks an award of the greater of the actual damages suffered or the statutory damages; punitive damages; attorneys' fees and other costs of this action; and appropriate equitable relief.

## COUNT V

## CONVERSION

254.     JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

255.     In addition to the confidential information, trade secrets, and intellectual property described above, JCorps owned or had the right to possess or control other property, assets, and resources.

256.     This property includes the JCorps-Israel entity and its assets, organizational documents, and other printed materials.

257.     JCorps further had the right to have and use such property for the sole benefit of JCorps.

258.     JCorps did not consent or authorize any of the Defendants to sell or transfer JCorps' property, nor to use JCorps' property and trade secrets for any purpose other than for the benefit of JCorps, in accordance with JCorps' 'Guidelines and Rules.'

259.     Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, OneDay, and Blumental wrongfully and willfully asserted and exercised dominion and control over JCorps' property and assets, including its trade secrets, organizational documents, other printed materials.

260.     For example, upon information and belief, each of Defendant Schusterman, Defendant OneDay, and Defendant Blumental intentionally appropriated JCorps-Israel property and assets to collectively orchestrate a "Tu B'Shvat Seder" ceremony occurring on or about February 5, 2016.

261. These assets, accounts, and resources include Israeli corporation no. 514847730 – i.e., JCorps-Israel – which Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, OneDay, and Blumental used to fund, coordinate, and orchestrate their collective activities, including the referenced ceremony.

262. Upon information and belief, each of Defendants have intentionally appropriated JCorps' property and assets, including its trade secrets, organizational documents, other printed materials, on numerous other occasions.

263. These willful actions by each of Defendants are inconsistent with JCorps' ownership of the referenced property, assets, accounts, organizational documents, other printed materials, resources, confidential information, and trade secrets.

264. As a result of each of Defendants' conversion of JCorps' property, JCorps was harmed and each Defendants' conduct was a substantial factor in causing JCorps' harm. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

265. Upon information and belief, each of Defendants intend to continue to convert JCorps' property unless restrained and enjoined by this Court.

## COUNT VI

## AIDING AND ABETTING CONVERSION

266. JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

267. Upon information and belief, Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman knew that JCorps owned or had the right to possess or control its confidential

information, trade secrets, organizational documents, other printed materials, property and other assets described above, including the JCorps-Israel entity and its property and assets.

268.    Defendant Schusterman further knew that Defendant OneDay and Defendant Blumental did not own or control JCorps' organizational documents, other printed materials, confidential information, trade secrets, property and other assets and was further prohibited from appropriating JCorps' property for purposes outside JCorps.

269.    Despite this knowledge, upon information and belief, Defendant Schusterman knowingly provided substantial support and assistance, including financial and operational assistance, to Defendant OneDay and Defendant Blumental, in furtherance of OneDay and Blumental's conversion of JCorps' organizational documents, other printed materials, confidential information, trade secrets, property and other assets.

270.    As a result of Defendant Schusterman's intentionally aiding and abetting the conversion by Defendant OneDay and Defendant Blumental, JCorps has been damaged and Defendant Schusterman's conduct was a substantial factor in causing this damage. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

271.    Upon information and belief, Defendant Schusterman intends to continue to aid and abet the conversion of JCorps' property unless restrained and enjoined by this Court.

## COUNT VII

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS UNDER OKLAHOMA LAW

272.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

273.    By the above-alleged acts, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, OneDay, and Blumental have interfered and continue to interfere with JCorps' existing and prospective business relationships with participants and prospective participants (including, upon information and belief, Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others), and prospective and actual partners (including, upon information and belief, the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews, and other organizations).

274.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, OneDay, and Blumental, with full knowledge of JCorps' business relationships, intentionally interfered and continue to interfere with those relationships by, *inter alia* operating and promoting the competing OneDay organization and using JCorps' trade secrets, confidential information, and property to develop and promote products and services, by using JCorps' trade secret information to directly target and solicit JCorps' participants.

275.    Upon information and belief, the unlawful and improper acts of each of Defendants, as alleged above, also prevented and continue to prevent participants and other third parties from entering into business relationships with JCorps (including, upon information and belief, the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews, and other organizations).

276.    Upon information and belief, each of Defendants' conduct was motivated solely by malice and/or to inflict injury on JCorps by unlawful means.

277.    As a direct and proximate result of each of Defendants' conduct, each of Defendants have and continue to injure JCorps by denying business to and diverting business

opportunities from JCorps, which JCorps would have otherwise had and from which it would have derived benefits and/or other tangible success.

278.    Upon information and belief, by their acts alleged above, each of Defendants have made and will make substantial profits and gains to which they are not in law or equity entitled.

279.    Each of Defendants' tortious interference with JCorps' business relationships has caused and will continue to cause JCorps substantial injury, including, but not limited to actual damages, lost benefits, harm to its reputation, and the diminution in value of its business. Each of Defendants have been unjustly enriched by their unlawful conduct.

280.    Each of Defendants' tortious interference with JCorps' business relationships was intentional, knowing, willful, malicious, fraudulent, and oppressive. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

281.    Upon information and belief, each of Defendants intend to continue to interfere with JCorps' business existing and prospective business relationships unless restrained and enjoined by this Court.

## COUNT VIII

### AIDING AND ABETTING TORTIOUS
### INTERFERENCE WITH BUSINESS RELATIONSHIPS

282.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

283.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman had full knowledge of JCorps' business relationships, JCorps' policies and Blumental's obligations to JCorps, and full knowledge that Defendants OneDay and Blumental were intentionally interfering with those relationships by, *inter alia*, using JCorps' trade secrets, confidential information, and property to develop and promote products and services to directly

target and solicit JCorps' participants (including, upon information and belief, Yaniv Rivlin, Alicia Post, Adina Lieberman, Daniel Cohen, Michelle Cohen, Efrat Margalit, Maytav Cohen, Natali Cohen, Elad Shoshan, Hilla Zmiri, Victor Portnoy, and others).

284. Despite this knowledge, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman knowingly provided substantial support and assistance, including financial and operational assistance, to Defendants OneDay and Blumental, in furtherance of OneDay and Blumental's tortious interference with JCorps' business relationships.

285. Each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman also actively promoted the unlawful activities of OneDay and Blumental, solicited others to provide additional support to OneDay and Blumental, and provided training to OneDay and Blumental, all in furtherance of OneDay and Blumental's conversion of JCorps' confidential information, trade secrets, property and other assets.

286. Upon information and belief, the unlawful and improper acts of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman, as alleged above, also prevented and continue to prevent participants and other third parties from entering into business relationships with JCorps (including, upon information and belief, the Jewish Federation of Los Angeles, Nefesh B'Nefesh, Google, and The International Fellowship of Christians and Jews, and other organizations).

287. Upon information and belief, the conduct of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman was motivated solely by malice and/or to inflict injury on JCorps by unlawful means.

288. As a result of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman intentionally aiding and abetting Defendants OneDay and Blumental's tortious

interference with JCorps' business relationships, JCorps has been damaged and each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman's conduct was a substantial factor in causing this damage. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

289.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman intend to continue to aid and abet Defendant OneDay and Defendant Blumental's tortious interference with JCorps' business relationships unless restrained and enjoined by this Court.

**COUNT IX**

**FRAUD (AS TO DEFENDANT BLUMENTAL)**

290.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

291.    Upon information and belief, Defendant Blumental represented to JCorps that he agreed to and would conduct himself in accordance with JCorps' guidelines and rules in connection with his role as a 'Team Leader' of JCorps.

292.    In doing so, Defendant Blumental represented that he would in good faith perform all legal and fiduciary obligations required of him in his role as a Team Leader in carrying out the objectives and protecting the interests of JCorps.

293.    Defendant Blumental further acknowledged the proprietary nature of JCorps' trade secrets (including participant lists, donor lists, contact information, internal procedures, policies, and materials, social media accounts and content, and other information) and other intellectual property and recognized JCorps' sole ownership and control of all such trade secrets and intellectual property.

294.     Defendant Blumental further represented that all work he performed in connection with his work for JCorps is the property of JCorps.

295.     Defendant Blumental further acknowledged and represented that JCorps resources would not be used to organize or promote initiatives that are religious in nature.

296.     Upon information and belief, the foregoing representations by Defendant Blumental were false and untrue. In fact and in truth, Defendant Blumental intended to divert and misappropriate JCorps' confidential information, trade secrets, property and other assets and to utilize to the full extent possible JCorps' unique skill and expertise in his own competing business or otherwise for improper purposes.

297.     Upon information and belief, the representations made by Defendant Blumental were false and were known to be false by Defendant Blumental when made.

298.     Upon information and belief, Defendant Blumental further pledged his unqualified loyalty and cooperation in protecting JCorps' business and the confidential information, trade secrets, property and other assets which were entrusted to him by virtue of his role as a Team Leader.

299.     Upon information and belief, all of the aforesaid representations by Defendant Blumental were made for the purpose and with the specific intent of deceiving and defrauding JCorps and to induce JCorps in reliance thereon to believe Defendant Blumental's representations as aforesaid.

300.     Upon information and belief, all of the aforesaid representations and acts by Defendant Blumental were made for the benefit of and on behalf of himself and Defendant OneDay. Upon information and belief, Defendant Blumental employed the artifice of fraud to

misappropriate and divert JCorps' confidential information, trade secrets, property and other assets.

301.    Upon information and belief, the foregoing misrepresentations, fraud and deceit were perpetrated by Defendant Blumental with the specific intent to extract an unfair and illegal advantage from JCorps.

302.    Upon information and belief, JCorps believed in the unqualified loyalty pledged by Defendant Blumental and that the aforesaid statements and representations made by Defendant Blumental with respect to the protection and operation of JCorps were true.

303.    As a result of the fraud and deceit perpetrated by Defendant Blumental against JCorps, JCorps was harmed and Defendant Blumental's conduct was a substantial factor in causing JCorps' harm. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

## COUNT X

### AIDING AND ABETTING FRAUD

304.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

305.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman had full knowledge of Defendant Blumental's obligations and representations with respect to JCorps' business, interests, objectives, confidential information, trade secrets, property and other assets.

306.    Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman had full knowledge that Defendant Blumental's representations were false and untrue and that Defendant Blumental intended to divert and misappropriate JCorps' confidential

information, trade secrets, property and other assets in his own competing business or otherwise for improper purposes.

307.    Despite this knowledge, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman knowingly provided substantial support and assistance, including financial and operational assistance, to Defendant Blumental, in furtherance of Blumental's deceiving and defrauding of JCorps to extract an unfair and illegal advantage from JCorps.

308.    Each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman also actively promoted the unlawful activities of Blumental, solicited others to provide additional support to Blumental, and provided training to Blumental, all in furtherance of Blumental's deceiving and defrauding of JCorps.

309.    Upon information and belief, the conduct of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman was intentional, motivated solely by malice and/or to inflict injury on JCorps by unlawful means.

310.    As a result of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman intentionally aiding and abetting the fraud and deceit perpetrated by Defendant Blumental against JCorps, JCorps was harmed and the conduct of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman was a substantial factor in causing JCorps' harm. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

## COUNT XI

### BREACH OF FIDUCIARY DUTIES (AS TO DEFENDANT BLUMENTAL)

311.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

312.    At all pertinent times referenced herein, Defendant Blumental held an executive-level role within JCorps with access to confidential information, trade secrets, business plans, property and other assets of JCorps.

313.    In his role as a Team Leader of JCorps, Defendant Blumental owed and continues to owe JCorps a fiduciary duty to not steal, misappropriate or convert JCorps' confidential information, trade secrets, business plans, property and other assets of JCorps. Defendant Blumental further owed JCorps his undivided and unqualified loyalty and was obligated to carry out his corporate duties in good faith, without theft or misappropriation, and for the benefit JCorps.

314.    The above obligations are imposed by operation of law and were also agreed upon by JCorps and Defendant Blumental.

315.    By operation of law, and by agreement, the fiduciary duties and other obligations owed by Defendant Blumental to JCorps required that Blumental, in the performance of his duties for JCorps, to refrain, *inter alia*, from: pursuing private business interests that conflict with business interests of JCorps, deriving a personal profit at the expense of JCorps, doing anything that might waste, or in any way diminish the value of, the trade secrets, confidential information, property, or any other assets of JCorps, usurping for his own benefit or advantage business opportunities rightly belonging to JCorps, acquiring, converting or misappropriating property, assets or interests in which JCorps has an interest or a reasonable expectation of such interest, including trade secrets, confidential information, property, assets, or business opportunities, interfering with the conduct of the business of JCorps, including the relationship between JCorps and its participants, contacts and donors, and engaging individually or collectively in a business or endeavor which competes with the JCorps and violates JCorps' legal rights and its rights in JCorps' confidential information, trade secrets, business plans, property and other assets of JCorps.

316.    Upon information and belief, and unknown to JCorps, Defendant Blumental embarked upon a calculated and intentional plan to misappropriate, convert and steal confidential information, trade secrets, business plans, property and other assets of JCorps.  JCorps' trade secrets include, *inter alia*, confidential participant lists and personal information, donor and contact lists, administrative access to and control of social media accounts, confidential business and fundraising plans, internal policies, procedures, and materials, technologies, proprietary databases, and other valuable proprietary information.

317.    Upon information and belief, Defendant Blumental is now actively employed in a competing business as Chief Executive Officer of Defendant OneDay, performing essentially the same functions he fulfilled for JCorps and targeting the very same business, economic and participant demographics.

318.    Defendant Blumental breached his aforesaid obligations and duties to JCorps by establishing a competing business and intentionally misappropriating, converting, and stealing confidential information, trade secrets, business plans, property and other assets of JCorps on behalf of himself and Defendant OneDay.

319.    Defendant Blumental willfully, wantonly and maliciously breached his fiduciary duties and obligations to JCorps in the manner set forth above.

320.    JCorps has been damaged and continues to be damaged by the foregoing acts perpetrated by Defendants.

321.    Specifically, without limitation, JCorps has been and continues to be damaged in the following manner: loss of participants, donations, contacts and proprietary information, as a result of Defendant Blumental's wrongful acts and diversion of opportunities from JCorps; interference with the conduct and business of JCorps by virtue of Defendants' misconduct and

affirmative actions; interference with the conduct and business of JCorps by the wrongful, diversion and solicitation of JCorps' participants, contacts and/or donors; and, use of the confidential information, trade secrets, business plans, property and other assets of JCorps.

322.   The acts and conduct of Defendants as alleged above were and are intentional, willful, wanton and malicious.

323.   As a result of the Defendant Blumental's breach of his fiduciary duties to JCorps, JCorps has been damaged. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

**COUNT XII**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

324.   JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

325.   Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman had full knowledge of Defendant Blumental's obligations and fiduciary duties to JCorps.

326.   Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman knew that Defendant Blumental was engaging in acts that constituted a breach of those fiduciary duties, including, *inter alia*, establishing a competing business and intentionally misappropriating, converting, and stealing confidential information, trade secrets, business plans, property and other assets of JCorps on behalf of himself and Defendant OneDay.

327.   Despite this knowledge, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman knowingly provided substantial support and

assistance, including financial and operational assistance to Defendant Blumental, in furtherance of Blumental's breach of his fiduciary duties to JCorps.

328.     Each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman also actively promoted the unlawful activities of Blumental, solicited others to provide additional support to Blumental, and provided training to Blumental, all in furtherance of Blumental's breach of his fiduciary duties to JCorps.

329.     Upon information and belief, the conduct of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman was motivated solely by malice and/or to inflict injury on JCorps by unlawful means.

330.     As a result of each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman intentionally aiding and abetting Defendant Blumental's breach of his fiduciary duties to JCorps, JCorps has been damaged and the conduct of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman was a substantial factor in causing this damage. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

331.     Upon information and belief, each of Defendants Schusterman, Cardin, Eisen, and Lynn Schusterman intend to continue to aid and abet Defendant Blumental's breach of his fiduciary duties to JCorps unless restrained and enjoined by this Court.

## COUNT XIII

## UNJUST ENRICHMENT

332.     JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

333.    By the unlawful conduct alleged above, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, One Day, and Blumental have been unjustly enriched to the detriment of JCorps' business and professional expectancies.

334.    Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, One Day, and Blumental have unlawfully taken and retained from JCorps the value of its trade secrets and confidential information, intellectual property, existing and prospective business relationships, property (including its organizational documents, other printed materials), and assets, without just compensation to JCorps.

335.    Upon information and belief, by the above-alleged acts, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, One Day, and Blumental have made and will make substantial profits and gains to which they are not in law or equity entitled.

336.    For example, upon information and belief, each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, Blumental, and OneDay have used printed materials which are the property of JCorps to benefit Defendants' activities, including by using and/or distributing such printed materials at the Tu B'Shvat Seder and the Leadership Seminar.

337.    As a direct and proximate result of each of Defendants' above-alleged acts, JCorps has suffered irreparable harm and damage and is suffering monetary damages in an amount to be determined at trial.

338.    The circumstances surrounding Defendants' acts are such that equity and good conscience require Defendants to make full restitution to JCorps for their unjust enrichment.

339.    Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

68

## COUNT XIV

## BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

340.    JCorps realleges and incorporates by reference each and every allegation set forth in the above paragraphs.

341.    The JCorps guidelines and rules and other assurances between JCorps and each of Defendants Schusterman, Cardin, Eisen, Lynn Schusterman, One Day, and Blumental impose an obligation of good faith and fair dealing on Defendants.

342.    Each of Defendants owed JCorps a duty to deal fairly and in good faith, including but not limited to, a duty to refrain from reducing the goodwill of JCorps, to maintain the secrecy and refrain from misappropriating and unlawfully using and disclosing JCorps' trade secrets and confidential information, and to avoid from tortuously interfering with JCorps' business relationships.

343.    By the acts described above, each of Defendants breached these duties by, *inter alia*, misappropriating and unlawfully using and disclosing JCorps' trade secrets and confidential information to establish, develop, and promote competing products and services and to solicit existing and prospective participants away from JCorps.

344.    As a direct and proximate result of Defendants' breaches, JCorps was deprived of the JCorps guidelines and rules and other assurances between JCorps and Defendants.

345.    Defendants' conduct, as alleged-above, has caused and will continue to cause JCorps substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its business.

69

346.    Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. JCorps is entitled to an award of exemplary damages and reasonable attorneys' fees.

347.    Upon information and belief, Defendants intend to continue their conduct unless restrained and enjoined by this Court.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

## DEMAND FOR RELIEF

Plaintiff requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

a.   Awarding damages as described in each of the above claims, in favor of Plaintiff and against Defendants in amounts to be determined at trial;

b.   Granting a temporary restraining order, and preliminary and permanent injunction against Defendants, enjoining them from violating their legal and contractual duties to Plaintiff, from accessing, using or disclosing Plaintiff's trade secrets and from any further infringement of Plaintiff's intellectual property;

c.   Awarding punitive damages in favor of Plaintiff and against Defendants in an amount to be determined at trial;

d.   Awarding Plaintiff pre-judgment and post-judgment interest, and its attorneys' fees, costs and other expenses incurred in this action;

e.   Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED,

June 21, 2021

/s/Kathleen Pence
E. Kathleen Pence, OBA No. 30902
Pence Law Firm, P.C.
P.O. Box 1038
Jenks, Oklahoma 74037
Phone: (918) 367-8505

*Attorneys for Plaintiff*
*JCorps*

## CERTIFICATE OF SERVICE

I hereby certify that on United States District Court Northern District Of Oklahoma that the foregoing **First Amended Complaint** was sent to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

George B. Fleming                    Benjamin Fishman

Harry Sandick                        Phillip Raymond Richards

John Jay Carwile

/s/Kathleen Pence
E. Kathleen Pence